AO 91 (Rev. 11/11) Criminal Complaint                      AUSA Jasmina Vajzovic  (312) 469-6233

**FILED**
6/26/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

DEVANTE T. BROWN and
COREY SARTIN

CASE NUMBER: 22 CR 326

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### Count One

Between on or about April 8, 2022 and on or about June 24, 2022, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(a)(1)(A) and Section 2 | willfully engaged in the business of dealing in firearms without a license |

### Count Two

Between on or about April 8, 2022 and on or about June 24, 2022, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants violated:

| | |
|---|---|
| Title 18, United States Code, Section 371 | conspired with each other, and with others unknown, to violate the laws of the United States, namely, willfully engaging in the business of dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A) |

### Count Three

On or about June 24, 2022, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant, DEVANTE T. BROWN, violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(g)(1) | knowing that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess, in and affecting interstate commerce, a firearm, namely, a Glock, Model 23, .40 caliber semiautomatic pistol bearing serial number BCXV991; Walther, Model UZI Pistol, .22 caliber semiautomatic pistol bearing serial number W1018088; Romarm/Cugir, Model Micro |

Draco 7.62x39 caliber semiautomatic pistol bearing serial number PMD-17851-19; Century Arms, Model VSKA Pistol, 7.62x39 caliber semiautomatic pistol bearing serial number SV7P007415; Interarms, Model Sporter, 7.62x39 caliber semiautomatic rifle bearing serial number PAC1118656; I.O. Inc, Model Sporter, 7.62x39 caliber semiautomatic rifle bearing serial number S004592; Century Arms, Model VSKA, 7.62x39 caliber semiautomatic rifle bearing serial number SV7065232; I.O. Inc, Model Sporter, 7.62x39 caliber semiautomatic rifle bearing serial number S030772; which firearm had traveled in interstate commerce prior to defendant's possession of the firearm

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.


*Thomas Spratte*
THOMAS SPRATTE
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: June 26, 2022

*Judge's signature*

City and state: Chicago, Illinois          YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, THOMAS SPRATTE, being duly sworn, state as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), and have been so employed since August 2019. My current responsibilities include the investigation of federal firearms offenses, including firearms trafficking and unlawful possession of firearm and ammunition by convicted felons.

2.      This affidavit is submitted in support of a criminal complaint alleging that DEVANTE T. BROWN and COREY SARTIN have willfully engaged in the business of dealing in firearms, in violation of Title 18, United States Code, Section 922(a)(1)(A); conspired with each other, and with others unknown, to violate the laws of the United States, namely, willfully engaging in the business of dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A), in violation of Title 18, United States Code, Section 371; and that DEVANTE T. BROWN unlawfully possessed a firearm as a felon, in violation of Title 18, United States Code, Section 922(g)(1).

3.      The facts set forth in this affidavit are based on my personal knowledge, my training and experience, and information provided to me by various law enforcement personnel and witnesses.  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint,

I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offenses alleged in the complaint.

## I.   FACTS SUPPORTING PROBABLE CAUSE

4.   As described in more detail below, between April 8, 2022 and June 24, 2022, Corey SARTIN and Devante BROWN communicated with a confidential source and an undercover officer to transport firearms into the Chicagoland area to sell to the confidential source and the undercover officer. More specifically, on or about April 9, 2022, SARTIN sold a firearm to the undercover officer, after arranging the transaction with the confidential source. On or about May 31, 2022, SARTIN and BROWN sold four firearms to the undercover officer, after SARTIN arranged the transaction with the confidential source. Finally, on or about June 24, 2022, SARTIN and BROWN transported 10 firearms from Indianapolis to Chicago to sell to the undercover officer. Prior to the transaction, BROWN communicated with the undercover officer to arrange the transaction.

5.   In approximately February 2022, a confidential source ("CS-1")[1] notified ATF that an individual CS-1 knew as "Lil Corey" was trafficking firearms from Indiana to the Chicagoland area. Law enforcement later identified Lil Corey as Corey

---

[1] CS-1 has one felony conviction for burglary. CS-1 has worked with ATF from approximately February 2022 through the present. CS-1 is cooperating with ATF in exchange for consideration on federal firearm charges. CS-1 has also been paid approximately $1,400 dollars for his/her cooperation with law enforcement. Law enforcement believes CS-1 to be a reliable source of information because information provided by CS-1 has been corroborated by recorded communications and surveillance and has led to the seizure of firearms.

SARTIN. According to CS-1, CS-1 and SARTIN had a relationship prior to February 2022.

**A.      On April 9, 2022, SARTIN sold a firearm to an undercover officer.**

6.      On or about April 8, 2022, SARTIN,[2] using an iCloud account by the name coreysartin1234@gmail.com, contacted CS-1 over iCloud messenger.[3] In the messages, SARTIN sent a photograph of what appeared to be two firearms on an individual's leg, along with the messages, "You want it?" and "I'm coming tomorrow."[4] Acting at the direction of law enforcement, CS-1 asked about the price of the firearm, and SARTIN replied that the firearm was a "mos," referring to a specific type of firearm, and the firearm would cost a "stack," meaning $1,000.  CS-1 then stated, "so 2,000 for both." SARTIN replied, "I'm not selling my other one." CS-1 and SARTIN then started exchanging messages through Facebook Messenger.

---

[2] Law enforcement identified SARTIN as the user of this account based on information provided by CS-1 and because law enforcement identified the individual who met with CS-1 and the UC on April 9, 2022 as SARTIN.

[3] Unless otherwise noted, CS-1 provided law enforcement with copies of the messages exchanged over iCloud Messenger and Facebook Messenger.

[4] At various points in this affidavit, I will offer my understanding and interpretation of certain statements, including intercepted or recorded conversations, in bracketed comments or during the description of the conversation. My understanding and/or interpretation of these conversations is based upon the contents of the conversations, the context of both prior and subsequent conversations, information received from confidential sources and other law enforcement officials, my knowledge derived from this investigation, and my experience and familiarity with firearms trafficking. Except as noted, the summaries of conversations contained in this affidavit that occurred in relation to the controlled purchase of firearms represent a review of the audio and video recordings and do not represent finalized transcripts of the conversations and may not represent the entire conversation that occurred between the identified individuals.

7. According to CS-1, at approximately 1:40 p.m., CS-1, placed a recorded Facebook video call to SARTIN, who was using a Facebook profile name of "Corey Sartin." According to CS-1 and the recording of the call, during the call, SARTIN told CS-1 that he would be traveling to the area the following day and would be in possession of firearms available for sale.

8. Shortly after the video call, SARTIN, using the Corey Sartin Facebook account, sent the message, "Cuz" to CS-1, followed by a photograph of a tan handgun and the word, "band," which CS-1 understood to mean $1,000. CS-1 then asked, "You got it"?

9. According to CS-1, at approximately 3:06 p.m., CS-1, and SARTIN, who was using the Corey Sartin Facebook account, again communicated through a recorded video call over Facebook Messenger. According to CS-1 and the recording of the call, during the call, SARTIN and CS-1 discussed the purchase of the firearm for the following day. After the call, at approximately 5:59 p.m., SARTIN, using the Corey Sartin Facebook account, sent CS-1 a Facebook message stating, "Aye," and "You want it?" along with a photograph of a firearm.

10. According to CS-1, later that evening, CS-1, and SARTIN, who was using the Corey Sartin Facebook account, again communicated through a video call over Facebook Messenger. According to CS-1, during that call, SARTIN stated that he would have at least two firearms available for purchase the following day and CS-1 told SARTIN that he would purchase the available firearms the next day. SARTIN

4

told CS-1 that he would attempt to find more firearms available for purchase and that the two firearms available for sale at the time of the calls would cost $2,000.

11.     On or about April 9, 2022, CS-1 and SARTIN, who was using the Corey Sartin Facebook account, communicated regarding the purchase of the firearms. CS-1 and SARTIN agreed to meet in the parking lot of a sports center complex located at approximately 2030 Glenwood Dyer Road, in Lynwood, Illinois.

12.     At approximately 12:13 p.m. an undercover officer ("UC-1") and CS-1 arrived at the parking lot of the sports center complex in Lynwood, Illinois in an undercover vehicle. Prior to the meeting, UC-1 and the undercover vehicle were equipped with audio/video recording devices. Upon arriving at the parking lot of the sports center complex, CS-1, placed a Facebook call to SARTIN, who was using the Corey Sartin Facebook account and asked SARTIN where he was located. According to CS-1 and UC-1, SARTIN told CS-1 that he was coming to find CS-1.

13.     According to UC-1 and the audio/video recording, shortly after the call, SARTIN walked up to the undercover vehicle and entered the back seat of the undercover vehicle. Once inside of the undercover vehicle, SARTIN gave UC-1 a Glock model pistol. UC-1 examined the Glock pistol and handed SARTIN $1,000. During the transaction, SARTIN placed another pistol on the seat next to him and stated, "This my baby right here." CS-1 asked SARTIN if SARTIN was going to sell the pistol he had next to him. SARTIN stated he was not. According to UC-1 and the audio/video recording, CS-1 asked SARTIN, "there one up in there," meaning whether there was ammunition in the pistol next to SARTIN. SARTIN responded, "Of course." According

5

to UC-1, after the transaction was concluded SARTIN took his firearm off the seat and exited the undercover vehicle and walked into the sports complex.

14.     Law enforcement later identified the firearm as a Glock model 23 .40 caliber pistol bearing serial number DTM652 with a magazine containing fourteen rounds of ammunition.

### B.     On May 31, 2022, BROWN and SARTIN sold four firearms to UC-1.

15.     On or about May 26, 2022, CS-1 sent a Facebook message to SARTIN, who was using the Corey Sartin Facebook account and asked, "It's gone", referring to an AR style rifle that SARTIN had previously offered for sale. SARTIN replied, "Naw is here." CS-1 asked, "What else you got with that," meaning what additional firearms did SARTIN have available for sale. According to CS-1, SARTIN then attempted to place a video call to CS-1 over Facebook Messenger, which CS-1 did not answer. SARTIN then sent the following Facebook messages to CS-1: "Call me asap" and "Gotta micro Draco, ar, 2 Glocks, 30," meaning SARTIN had multiple firearms for sale including a mini Draco, AR style rifle, and handguns for sale.

16.     At approximately 2:51 p.m., CS-1 had several Facebook video calls with SARTIN, who was using the Corey Sartin Facebook account.[5] According to CS-1, during the calls, SARTIN informed CS-1 of the firearms he had available for sale and displayed the firearms available for sale on the video. CS-1 asked SARTIN if he could conduct the transaction on a future date, to which SARTIN agreed.

---

[5] These calls over Facebook Messenger were not recorded because CS-1 did not have the ability to record calls placed over Facebook Messenger.

17.     On or about May 30, 2022, at approximately 11:11 p.m., CS-1 sent the following Facebook messages to SARTIN, who was using the Corey Sartin Facebook account: "He still got that," "I have the bread in the morning," and "Around 12", meaning CS-1 would have the money to purchase the firearms the following day around 12:00 p.m. SARTIN replied, "How much?" CS-1 stated, "Depends on what he got." SARTIN then replied with a photograph of a shotgun, an AR style rifle, an AR style pistol, an AK style pistol, and a Glock pistol along with the messages, "6500," "The whole trip," "and everything in that picture," and "If not I'll grab more and we can just wait come with 10k worth." Based on my training and experience, the training and experience of other law enforcement officers, information received from CS-1, and the context and the content of the conversation, I believe that SARTIN was informing CS-1 that the purchase price of the five firearms in the photograph was $6,500 or that CS-1 could wait until SARTIN had more firearms with a total purchase price of $10,000. SARTIN and CS-1 also discussed CS-1 purchasing the firearms for $5,800 without the shotgun.

18.     On or about May 31, 2022, starting at approximately 9:30 a.m., CS-1 communicated with SARTIN, who was using telephone number 317-xxx-0655 to arrange the transaction. During the calls, which were recorded, CS-1 and SARTIN discussed meeting later that afternoon in Chicago, Illinois for the firearms transaction.

19.     On or about May 31, 2022, at approximately 2:07 p.m., two undercover officers ("UC-1" and "UC-2"), and CS-1 drove in an undercover vehicle to a retail store

parking lot located at approximately 10830 S. Doty Avenue in Chicago, Illinois. Prior to arriving to the location of the transaction, the UCs and the undercover vehicle were equipped with audio/video recording devices.

20.    At approximately 2:20 p.m., while in the undercover vehicle with UC-1 and UC-2 and at the direction of law enforcement, CS-1 placed a recorded call to SARTIN, who was using phone number 317-xxx-0655, and placed the call on speakerphone. CS-1 asked SARTIN where he was and SARTIN responded that he was "getting off the exit" and was going to stop at the gas station before heading to the meeting location.

21.    At approximately 2:36 p.m., law enforcement observed a red Ford sedan with an Indiana license plate park next to the undercover vehicle. SARTIN[6] and an individual later identified as Devante BROWN[7] exited the vehicle and approached the undercover vehicle. SARTIN opened the rear passenger side door of the undercover vehicle and BROWN opened the rear driver's side door of the undercover vehicle. According to the UCs and the audio/video recording, BROWN then stated, "I got a lot of this shit in the bag, one of them too big for the bag." UC-1 observed two females in the red sedan, one in the driver seat and one in the back seat. According to the UCs, during the transaction, the two females did not exit the Ford sedan.

---

[6] Law enforcement identified this individual as SARTIN by comparing a known photograph of SARTIN to the individual who met with the UCs and CS-1 on or about May 31, 2022.

[7] Law enforcement identified this individual as BROWN by comparing a photograph of BROWN to the individual who met with UC-1 and CS-1 on or about May 31, 2022.

22.     According to the UCs, CS-1 then exited the undercover vehicle and SARTIN entered the front passenger seat of the undercover vehicle. CS-1 remained outside of the vehicle during the transaction. According to the UCs, once SARTIN was inside the vehicle, UC-1 asked SARTIN if he was dealing with SARTIN or BROWN. In response, SARTIN pointed at BROWN, who was still standing outside the undercover vehicle. According to the UCs, BROWN then retrieved a black bag from the trunk of the Ford sedan and placed it on the backseat of the undercover vehicle. BROWN also retrieved a rifle covered in a blue blanket from the trunk of the red Ford sedan and placed it in the backseat of the undercover vehicle. BROWN then entered the rear driver's side seat of the undercover vehicle. According to the UCs, BROWN introduced himself as "Arkansas."

23.     According to the UCs, UC-2 then removed the blanket from the rifle to examine it. SARTIN stated the rifle was a ".308," meaning a type of rifle. BROWN stated the stock could be taken off to make the firearm shorter. Talking about the .308 rifle, BROWN stated, "You ain't just riding around with that though…that's some shit you keep in the trap nigga. Get a nigga some get back. You feel me? They try come up nigga, you get back." Based on my training and experience, the training and experience of other law enforcement officers, and the context and the content of the conversation, I believe that BROWN was stating that the rifle was best used for protecting narcotics in a residence. A "trap" is commonly used to describe a residence or location where narcotics are stored and/or sold.

24.     According to the UCs, UC-2 removed three firearms from the bag that BROWN placed in the backseat of the undercover vehicle. Specifically, UC-2 removed an AR type firearm, a Glock pistol, and a Draco pistol from the bag.

25.     During the transaction, according to the UCs and the audio/video recording, BROWN stated that he would try and find more "Dracos," which is a type of firearm, to sell to the UCs. SARTIN stated, "I bust all these, all these bust…I know that 308 bust, I bust that with one hand," meaning that he had fired all four of the firearms and he knows that they are operable.

26.     According to the UCs and the audio/video recording, UC-2 asked if BROWN had any ammunition for the firearms. BROWN replied that he took all the ammunition out because he was meeting with the UCs and CS-1 for the first time, and he wanted everything to be "cool."

27.     According to the UCs and the audio/video recording, SARTIN stated, "I be having it at the time but [CS-1] busy," meaning there were times he had firearms available for sale, but CS-1 was unavailable to purchase the firearms. UC-1 told SARTIN he could contact UC-1 directly. BROWN stated if the UCs were "cool," meaning there weren't any issues between BROWN, SARTIN, and the UCs during the first transaction, he would be back with additional firearms. During the transaction, SARTIN stated that he and BROWN were going to try and bring ten Glocks and five Dracos during the next meeting. SARTIN also stated that SARTIN and BROWN hoped to sell the UCs additional firearms once a month.

28.     During the transaction, the UCs handed BROWN approximately $6,000 for the four firearms.

29.     According to the UCs and the audio/video recording, at the end of the transaction, UC-1 and BROWN agreed to exchange phone numbers. BROWN stated, "I do good business fam. I promise you nigga I'll be here to see yall once a month." BROWN also stated, "Yall need that yayo [cocaine]. Come make a trip. We can meet halfway. If I bring it nigga Imma tax you a little bit," meaning he would charge the UCs for the cost of the delivery if he had to bring the cocaine to Chicago.

30.     At approximately 2:43 p.m., UC-1 received a text message from phone number 317-xxx-2631 ("BROWN Phone") which stated, "Arkansaw." Following the text message, UC-1 also received two calls from 317-xxx-2631, which he did not answer. UC-1 understood this to be BROWN's number pursuant to their agreement to exchange numbers.

31.     At approximately 2:44 p.m., the UCs observed SARTIN and BROWN exit the undercover vehicle and return to the red Ford sedan.

32.     Beginning at approximately 2:46 p.m., BROWN, using BROWN Phone, and UC-1 exchanged the following messages:

| UC-1 | 02:46:35 PM | Bet good lookin out |
| BROWN | 02:48:00 PM | No doubt |
| BROWN | 08:56:53 PM | Send me a list of anything y'all boys be needing |
| UC-1 | 11:41:09 PM | Bet my people always looking for them dracos and glizzys [Glock firearms] |

11

| BROWN | 11:42:06 PM | Got it...just lmk [let me know] what else cuz I be coming across all kinds of shit |
| UC-1 | 11:44:32 PM | Ight bet |

33.     Upon further examination, law enforcement determined the firearms that BROWN gave to the UCs to be a) a DPMS Model LR-308 .308 rifle bearing serial number FFK012878 with a magazine; b) a Glock, Inc. Model 23 Gen4 semi-automatic pistol bearing serial number YMU729 with a magazine; c) a Tippman Arms Model M4-22 semi-automatic firearm bearing serial number 030756; and d) a Romarm/Cugir Model Micro Draco bearing serial number PMD-10523-19.

**C.     Between June 4, 2022 and June 24, 2022, BROWN and UC-1 arranged a firearms transaction to UC-1 for 10 firearms.**

34.     On or about June 4, 2022, at approximately 12:33 a.m., UC-1 sent a text message to BROWN, who was using BROWN Phone, stating, "Whats good bro." At approximately 1:07 p.m., BROWN, using BROWN Phone, responded, "Didn't you say you want the Full body AKs??," meaning a traditional AK style rifle.

35.     On or about June 5, 2022, at approximately 12:09 p.m., UC-1 sent a text message to BROWN, who was using BROWN Phone, stating, "Yea my boy was talkin about the full body ones...shit im good wit full body or the short ones wuteva u can get ur hands on u feel me."

36.     On or about June 7, 2022, beginning at approximately 2:00 p.m., BROWN, using BROWN Phone, and UC-1 exchanged the following messages:

| UC-1 | 02:00:36 PM | Whats good bro when u makin another trip up here?? |
| BROWN | 02:06:02 PM | 2 weeks |
| BROWN | 02:13:14 PM | Trynna have at least 5 AKs and some glocks for y'all |
| UC-1 | 03:32:04 PM | Bet thats whats up |

37.     On or about June 11, 2022, at approximately 3:30 p.m., UC-1 received a text message from BROWN, who was using BROWN Phone, which contained the following picture of two firearms:



38.     On or about June 12, 2022, beginning at approximately 8:21 p.m., BROWN, using BROWN Phone, and UC-1 exchanged the following messages:

| UC-1 | 08:21:36 PM | Damn those are nice asf [as expletive] |
| UC-1 | 08:21:48 PM | Whats the ticket [price] on em? |

| BROWN | 08:27:54 PM | Ghost glocks 1k [$1000] each untraceable[8] |
|-------|-------------|---------------------------------------------|
| UC-1 | 09:34:32 PM | U just got those 2? |
| BROWN | 09:46:44 PM | Naa got two Draco's [types of firearms] also but Im waiting rn [right now] imma have some shit for you just needed to know if y'all was interested |
| BROWN | 09:46:55 PM | I can grab more of those too... |
| UC-1 | 09:50:16 PM | Ight cool yea im interested in the ghosts too for sure |
| BROWN | 09:50:34 PM | I'll be n touch |
| UC-1 | 09:50:56 PM | Ight bet |

39.     Based on my training and experience, the training and experience of other law enforcement officers, and the context and the content of the conversation, I believe that BROWN had two firearms known as "dracos" in his possession and would get additional firearms to sell UC-1 if UC-1 was interested.

40.     On or about June 14, 2022, at approximately 6:41 p.m., UC-1 received a text message from BROWN, who was using BROWN Phone, which contained the following picture:

---

[8] Based on my training and experience, I know that guns that are assembled from gun kits without a serial number, making them undetectable and/or untraceable, are commonly referred to as "ghost" guns.

14



41.     Beginning at approximately 6:41 p.m., BROWN, using BROWN Phone,

and UC-1 exchanged the following messages:

| BROWN | 06:41:39 PM | Uzi .22 cal [type of .22 caliber firearm] |
|-------|-------------|-------------------------------------------|
| BROWN | 06:42:22 PM | Interested? |
| UC-1 | 08:39:17 PM | Hell yea... whats the ticket [price] on it?? |
| UC-1 | 08:39:54 PM | .22 cal is kinda weak but that shit looks cool |
| BROWN | 08:44:04 PM | Yeaaa .22 weak but they deadly ...don't sleep on em ..and I'm sure you can sell it to the lil homies...any gun I bring ain't no less than a stack [$1,000] simply cuz im traveling with em ..imma make it make sense every time .. |
| BROWN | 08:44:28 PM | Just trynna see if y'all want it or not |

| UC-1 | 08:51:40 PM | Oh yea I could sell it for sure and yea I feel u on that...I just gotta make sure I can eat off of whatever I get off u too u feel me |
|------|-------------|------|
| UC-1 | 08:52:58 PM | But yea I want that one |
| BROWN | 08:54:28 PM | Ok gotchu |
| UC-1 | 09:00:55 PM | U know when u coming back up? |
| BROWN | 09:03:18 PM | Before the month over |
| UC-1 | 09:10:16 PM | Ight bet...just let me know how many ur trying to bring so I can make sure I got the bread ready |
| BROWN | 09:11:21 PM | I'll let you know at least 3 days before ... |
| UC-1 | 09:11:53 PM | Ight cool |
| BROWN | 10:05:51 PM | Revolvers? |
| BROWN | 10:06:08 PM | Not I'm for a stack [$1,000] but bruh got one he want $500 for it |
| BROWN | 10:06:25 PM | Not for a stack but bruh got one for $500 .** |

42.    Based on my training and experience, the training and experience of other law enforcement officers, and the context and the content of the conversation, I believe that BROWN contacted UC-1 to offer UC-1 multiple firearms, including a .22 caliber UZI firearm for at least $1,000 and a revolver for $500.

43.    On or about June 16, 2022, at approximately 4:05 p.m., UC-1 received a text message from BROWN, using BROWN Phone, which stated ".38 Special," followed by a text message with the following picture:



44.     At approximately 4:09 p.m., BROWN, using BROWN Phone, sent UC-1 two text messages that stated, "Lmk if you get this video I sent," and "Grenade launchers." At that same time, UC-1 received a text that contained what appeared to be a screen recording from an Apple iPhone of a Youtube.com video. Although the video was unclear, UC-1 observed a person in the video holding an item and stating, "It says on here to only use flare smoke or gas rounds."

45.     Beginning at approximately 7:27 p.m., BROWN, using BROWN Phone, and UC-1 exchanged the following messages:

| UC-1 | 07:27:47 PM | Damn that revolvers beat the fuck up |
| UC-1 | 07:29:21 PM | Is that a youtube video? |
| BROWN | 08:21:57 PM | Yea U right but it blow tho...and yup youtube |

17

| UC-1 | 08:23:57 PM | How much for it? |
|------|-------------|------------------|
| BROWN | 08:24:50 PM | Not sure yet just seeing if interested |
| UC-1 | 08:28:23 PM | Send me the link to the video...the video u sent me isnt clear |
| UC-1 | 08:32:14 PM | U could get grenade launchers?? Thats crazy |
| BROWN | 08:38:34 PM | https://youtu.be/xCsaKsBwtm0 |
| BROWN | 08:39:24 PM | Hell yeaa they could be useful for tactical missions yfm [ya feel me] nobody expecting this type of shit in the streets |
| UC-1 | 09:04:34 PM | Haha u aint lying |

46.     Based on my training and experience, the training and experience of other law enforcement officers, and the context and the content of the conversation, I believe that BROWN told UC-1 that he could get grenade launchers, and that they could be used for "tactical missions," meaning planned violence, and that nobody would expect those types of weapons to be used.

47.     On or about June 18, 2022, beginning at approximately 5:01 a.m., BROWN, using BROWN Phone, and UC-1 exchanged the following messages:

| BROWN | 05:01:09 AM | If y'all need ammunition and accessories lmk [let me know] we can work a deal with that shit too |
|-------|-------------|--------------------------------------------------------------------------------------------------|
| UC-1 | 09:47:56 AM | Shit if u you could give us a good deal for some ammo we might be interested but we're good on accessories |

18

| BROWN | 11:41:07 AM | Start gathering your coins imma be letting you know everything we got by the end of day |
|---|---|---|

48. Based on my training and experience, the training and experience of other law enforcement officers, and the context and the content of the conversation, I believe that BROWN also offered to sell UC-1 ammunition. BROWN told UC-1 to start preparing money to purchase the firearms. BROWN also indicated he would let UC-1 know which firearms he had available for sale by the end of the day.

49. On the same date, at approximately 1:36 p.m., BROWN, using BROWN Phone, and UC-1 exchanged the following messages:

| BROWN | 01:36:52 PM | Didn't mean to call and do y'all want AR that shoot 7.62 if so I'm bout grab 3 of em |
|---|---|---|
| UC-1 | 01:39:46 PM | Hell yea for sure...just make sure they in better shape than that last AR u brought |
| BROWN | 01:40:29 PM | Brand new I got you |
| BROWN | 01:40:36 PM | And they AR pistols |
| UC-1 | 01:52:22 PM | Ight cool thats whats up |

50. Based on my training and experience, the training and experience of other law enforcement officers, information received from UC-1, and the context and the content of the conversation, I believe that BROWN asked UC-1 if UC-1 was interested in three AR type rifles. BROWN also indicated that the ARs were pistols and brand new.

51. At approximately 4:09 p.m., UC-1 received three text messages from BROWN, using BROWN Phone, which contained the following pictures:

19







52.     Based on my training and experience, the training and experience of other law enforcement officers, and the context and the content of the conversation, I believe that BROWN sent the pictures to indicate the firearms he had available and the price for each firearm.

53.     Beginning at approximately 5:21 p.m., BROWN, using BROWN Phone, and UC-1 exchanged the following messages:

| UC-1 | 05:10:23 PM | Damn you aint fuckin around |
|------|-------------|------------------------------|
| UC-1 | 05:11:15 PM | The ticket [price] on them AKs is way too high bro...no way I can eat off that |
| BROWN | 05:21:40 PM | I got what you asked fa and I can keep this going fa u . . . I can get all type of different shit ...when I hit the city I got mfs lined up for what y'all don't get ...I ain't ever say this was gone be super cheap Ik [I know] what you trynna do but this shit I'm doin is federal I'm gone make it make sense for me |
| UC-1 | 05:51:21 PM | I did ask for them and I want em all and Im tryin to keep this shit going too but the people I fuck wit up here aint payin 2500 for an AK... the ticket [price] on everything else is straight but them AKs too much |
| UC-1 | 05:53:48 PM | We should be gettin a better price since they comin from where u at |
| BROWN | 05:54:40 PM | So what do you suppose? |
| UC-1 | 06:12:31 PM | Look at the last deal ...it was 6 stacks [$6,000] for 4. Lets say the glizzy [Glock] was a stack. That means the other 3 were 5 stack [$5,000] . . . that means that draco ypu sold me was like [$]1600 now u tryin to charge [$]2500 |
| UC-1 | 06:12:52 PM | Thats crazy bro |
| BROWN | 06:39:49 PM | We sold the for [$] 2500 at least that's what we thought ...maybe it was some confusion n shit but I'm trynna do good business so again what do you propose.. |
| BROWN | 06:55:24 PM | Draco's in the store and on the street 2k you get lucky to find em cheaper cuz that's what everybody want ...maybe we |

| | | |
|---|---|---|
| | | can find a. Set price and work something out |
| UC-1 | 07:03:14 PM | Bro we flip shit up here thats what we do... I know what the prices are in the city u feel me...I feel like [$]1600 for each AK is fair especially since I already got a draco from you for around that price. |
| UC-1 | 07:04:08 PM | If thats too low we can talk but u gotta come down from 2500 |
| UC-1 | 07:04:32 PM | Im tryin to scoop all 10 so u should work with me |
| BROWN | 07:11:43 PM | 1k for the trip to you..All glocks 1k all AKs and Draco's 2k all AR 1500-1800 depending on caliber and any other shits we grab we can arrange a price but we can lock in on this right now ...this the best we can do .. |
| BROWN | 07:11:51 PM | That way everything be set and we know what to expect |
| BROWN | 07:14:12 PM | We gone need [$]2200 for the Draco's these the hardest ones to find |
| UC-1 | 07:16:03 PM | So u were gonna add 1k on top of the prices in the photo?? |
| BROWN | 07:17:14 PM | Yea it added up to 19k I was gone tell you 20k flat |
| UC-1 | 08:00:18 PM | Bro these prices dont match up to what I already paid you last time |
| BROWN | 08:02:53 PM | 19k is not the price any more I just told you what we could lock in for I think you confused... |
| UC-1 | 08:08:48 PM | We could do 16k for all 10 [$16,000 for 10 firearms] |

24

| | | |
|---|---|---|
| UC-1 | 08:09:12 PM | And on the next one we'll switch it up to ARs |
| BROWN | 08:17:30 PM | 17.5 [$17,500] |
| UC-1 | 08:28:10 PM | 16 [$16,000] is already higher than what we wanna pay im just tryin to make this work u feel me |
| BROWN | 08:28:56 PM | You killlllllinnngggg meeeeee...17 stiff man work with me |
| BROWN | 08:30:19 PM | I might be grabbing another lil shits tomorrow too |
| UC-1 | 08:30:28 PM | Bro u know u makin money with 16 [$16,000] |
| UC-1 | 08:30:52 PM | And we gonna keep this going with u |
| UC-1 | 08:31:12 PM | It just gotta make sense for us too u feel me |
| UC-1 | 08:45:41 PM | We got a deal?? |
| BROWN | 08:48:07 PM | 16k is cool if we letting glocks go for 1k and chops for 2k but I need another stack for my trip...only fair .I'm bringing em to your front door |
| BROWN | 08:48:43 PM | The profit ain't as much as you thinking ..guns ain't cheap fr [for real] they just legal |
| UC-1 | 08:50:33 PM | Im sayin though I still think the 2k per draco is too high im just tryin to work wit u |
| UC-1 | 08:50:52 PM | How bout 16.5 [$16,500] |
| UC-1 | 08:52:10 PM | I mean the other 4 arent even all glocks right |
| UC-1 | 08:53:03 PM | One is an uzi |
| UC-1 | 08:53:54 PM | Thats that .22 cal right? |

25

| BROWN | 08:54:07 PM | You don't understand these Draco's is the hardest things to find right now Everybody want a arm n a leg this our most prized possessions no bullshit ...and it's 3 glocks and one Uzi I already told you nothing we get will be less than 1k... |
|-------|-------------|---|
| BROWN | 08:54:19 PM | Yea we discussed the Uzi n glocks already |
| BROWN | 08:55:00 PM | Fuck it 16.5 is cool lmk [let me know] when you ready and we gotta discuss some terms in person ion [I don't] really like all this texting yfm [you feel me] this shit hot... |
| UC-1 | 08:55:29 PM | Ight bet |
| UC-1 | 08:55:39 PM | Yea I feel u |
| UC-1 | 08:55:50 PM | When were u tryin to come up? |
| BROWN | 08:56:38 PM | Trust me we gone keep you with all the artillery I come across guns all day long . . . we gone do good business together you'll see and whenever y'all ready |
| BROWN | 09:01:41 PM | Ready when y'all is |

54.     Based on my training and experience, the training and experience of other law enforcement officers, and the context and the content of the conversation, BROWN sent UC-1 photos with multiple firearms and prices for each. UC-1 and BROWN then negotiated the prices of the firearms.  Specifically, UC-1 indicated that the prices BROWN wanted to charge for the firearms was much higher than the prior transaction. BROWN noted that he needed to charge more because he was bringing them to UC-1's "front door," meaning he was bringing the guns into Chicago. During

the negotiations, BROWN agreed to sell UC-1 ten firearms for $16,500 and stated that he was ready to conduct the transaction.

55. On or about June 19, 2022, at approximately 10:52 p.m., BROWN, using BROWN Phone, sent a text message to UC-1 asking, "When y'all gone be ready.

56. On or about June 20, 2022, beginning at approximately 2:51 a.m., BROWN, using BROWN Phone, and UC-1 exchanged the following messages:

| UC-1 | 11:26:32 AM | Hey bro can u come up on Friday instead [June 24]?? |
| BROWN | 12:50:57 PM | If we wait til Friday I can't guarantee you everything will be the same ..some of the guys up there wanna spend too . . .I told em they can get what yall don't buy . . . I got it for y'all and honestly I ain't think y'all was gone grab all this ... |
| UC-1 | 02:02:57 PM | Damn u aint gonna make 2 trips though are u??...im splitting it again wit my boy and he said he needed a couple exta days but we gonna be good on Friday for sure |
| BROWN | 02:14:05 PM | Just hit me a day before y'all ready I'll lyk [let you know] wassup... |

57. Based on my training and experience, the training and experience of other law enforcement officers, and the context and the content of the conversation, I believe that BROWN and UC-1 agreed to meet on Friday, June 24, 2022. BROWN told UC-1 that some of the firearms may not be available if he sold them to his customers in advance.

58. On or about June 23, 2022, beginning at approximately 11:06 a.m., BROWN, using BROWN Phone, and UC-1 exchanged the following messages:

| BROWN | 11:06:06 AM | First thing tomorrow? |
|-------|-------------|-----------------------|
| UC-1 | 11:50:46 AM | I figured same time as last time...like around 2 [p.m.] |
| UC-1 | 11:51:22 AM | That work for u? |
| BROWN | 11:57:12 AM | Yes sir |
| BROWN | 11:57:27 AM | I'll shoot a text before I leave out |
| BROWN | 11:57:32 AM | Delete all our messages |
| UC-1 | 11:58:07 AM | Ight bet |
| UC-1 | 11:58:12 AM | Will do |

59.     At approximately 1:44 p.m., UC-1 placed a call to BROWN Phone. According to UC-1, BROWN stated that he was stuck in traffic and stated, "We twenty minutes out." UC-1 asked BROWN if BROWN wanted to meet at a meeting location in a storage facility. BROWN agreed and told UC-1 to send BROWN the location.

60.     At approximately 1:45 p.m., UC-1 sent a text message to BROWN Phone with the address of the meeting location.

**D.      On June 24, 2022, BROWN and SARTIN sold ten firearms to undercover officers, including two privately made firearms known as "ghost" guns.**

61.     On or about June 24, 2022, at approximately 2:24 p.m., UC-1, UC-2, and CS-1 drove in an undercover vehicle to a storage facility located in Calumet City, Illinois. Prior to arriving to the location of the transaction, both UCs were equipped with an audio/video recording device. The meeting location within the storage facility was also equipped with an audio/video recording device.

28

62.     Upon arrival to the storage facility, UC-1 observed BROWN driving a blue sedan with SARTIN in the front passenger seat. UC-1 signaled to BROWN to follow the undercover vehicle, and both the undercover vehicle and BROWN's vehicle traveled to the meeting location within the storage facility. According to the UCs and the audio/video recording, upon arrival to the meeting location, BROWN and SARTIN exited the vehicle. BROWN opened the trunk of his vehicle and asked UC-1 if there were any cameras. According to UC-1 and the audio/video recording, UC-1 told BROWN to leave everything in the bag until they were inside the meeting location. UC-1 then walked to the trunk of BROWN's vehicle and observed multiple firearms on a blanket. According to UC-1, BROWN wrapped the firearms in the blanket. UC-1 and BROWN then proceeded to carry the firearms wrapped in a blanket into the meeting location. Once inside the meeting location, BROWN and UC-1 placed the firearms on a table. According to the audio/video recording, SARTIN, UC-2, and CS-1 then also entered the meeting location.

63.     According to UC-1 and the audio/video recording, as BROWN and UC-1 were carrying the firearms into the meeting location, UC-1 stated, "Damn you made good time bro, cause you're coming from fucking Indianapolis, right?" BROWN stated, "yea two and a half hours." The UC-1 replied, "I thought it was three [hours]." BROWN responded, "Nah, you gotta you gotta know what you're doing. You know what I'm saying."

64.     According to UC-1 and the audio/video recording, once the firearms were on the table, BROWN stated, "Ay look man, before I leave today bruh, I wanna get

two things understood. I want to get some prices established and I wanna get. What I was gonna tell you. Prices established and I forgot but it'll come to me." BROWN stated that he and UC-1 weren't on the same page about the price of the firearms. UC-1 agreed with BROWN. During the conversation, UC-1 stated that he might switch to asking for AR type firearms. BROWN replied, "See that easy to get…we could fuck around and get you 100 ARs." SARTIN then stated, "100 ARs" in agreement.

65.     According to the UCs and the audio/video recording, during the transaction, while examining the firearms, UC-1 observed one of the AK type firearms had a round of ammunition loaded in the chamber of the firearm. According to the UCs and the audio/video recording, once UC-1 noted that the firearm was still chambered, SARTIN began clearing remaining rounds of ammunition from the firearms.

66.     According to the UCs and the audio/video recording, UC-2 then loaded the firearms into a storage container. UC-2 and CS-1 carried the container out towards the undercover vehicle while UC-1 placed $16,000 in buy money on the table for the purchase of the 10 firearms. As BROWN began counting the money, law enforcement entered the meeting location and arrested BROWN and SARTIN.

67.     Law enforcement later determined the firearms that BROWN and SARTIN gave to UC-1 to be:

   a.     Glock, Model 23, .40 caliber semiautomatic pistol bearing serial number BCXV991;

   b.     Walther, Model UZI Pistol, .22 caliber semiautomatic pistol bearing serial number W1018088;

c.   Romarm/Cugir, Model Micro Draco 7.62x39 caliber semiautomatic pistol bearing serial number PMD-17851-19;

d.   Century Arms, Model VSKA Pistol, 7.62x39 caliber semiautomatic pistol bearing serial number SV7P007415;

e.   Interarms, Model Sporter, 7.62x39 caliber semiautomatic rifle bearing serial number PAC1118656;

f.   I.O. Inc, Model Sporter, 7.62x39 caliber semiautomatic rifle bearing serial number S004592;

g.   Century Arms, Model VSKA, 7.62x39 caliber semiautomatic rifle bearing serial number SV7065232;

h.   I.O. Inc, Model Sporter, 7.62x39 caliber semiautomatic rifle bearing serial number S030772; and

i.   Two privately made firearms, also known as "ghost" guns.

68.   A picture of the firearms purchased from BROWN and SARTIN is shown below:[9]

---

[9] An additional firearm was seized from an individual in a second car that arrived to the storage facility with BROWN and SARTIN. That individual was not charged. The firearm seized from that individual has been redacted from the picture of the firearms seized from SARTIN and BROWN below.

31



**E.    Neither BROWN nor SARTIN possess a valid Federal firearms license to sell firearms.**

69.    Based on my training and experience, I know that federal law requires that a firearms dealer engaged in the business of dealing in firearms be licensed by ATF.

70.    According to information received from the ATF Federal Firearms Licensing Center, DEVANTE T. BROWN does not possess a valid Federal Firearms License (FFL). Additionally, according to law enforcement databases, DEVANTE T. BROWN does not possess a valid Firearms Owners Identification (FOID) card or Concealed Carry License (CCL).

71.    According to information received from the ATF Federal Firearms

32

Licensing Center, COREY SARTIN does not possess a valid Federal Firearms License (FFL). Additionally, according to law enforcement databases, COREY SARTIN does not possess a valid Firearms Owners Identification (FOID) card or Concealed Carry License (CCL).

### F. BROWN's Criminal History

72. Based on my review of BROWN's criminal history, I know that on or about May 31, 2016, BROWN was convicted of commercial burglary and possession of a firearm, both felonies that are punishable by more than one year of incarceration, in the Circuit Court of Chicot County, Arkansas, and sentenced to twenty-four months' probation and 106 days' imprisonment.

73. Further, on or about June 24, 2022, law enforcement conducted an interview with BROWN following his arrest. BROWN was informed of his *Miranda* rights, acknowledged those rights, and agreed to speak with law enforcement. During the interview, BROWN acknowledged that he knew he was a convicted felon and could not possess or obtain firearms legally.

### G. Interstate Nexus

74. On or about June 25, 2022, I spoke to ATF Special Agent David Lopez, who told me the following:

      a.    Special Agent Lopez is a certified interstate nexus expert for firearms and ammunition;

      b.    Based on his training and experience and the research he conducted, Special Agent Lopez determined that all of the firearms listed above in

33

paragraph 67, except for the two privately made firearms, were manufactured outside of the state of Illinois.

75.     Therefore, the firearms that BROWN possessed traveled in interstate commerce prior to BROWN's possession of the firearms.

## II.   CONCLUSION

76.     For all the reasons described above, I respectfully submit there is probable cause to believe that:

a.      Corey SARTIN and Devonte BROWN, willfully engaged in the business of dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A);

b.      Corey SARTIN and Devonte BROWN, conspired with each other, and with others unknown, to violate the laws of the United States, namely, willfully engaged in the business of dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A), in violation of Title 18, United States Code, Section 371; and

c.      Devonte BROWN, knowing that he had been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess, in and affecting interstate commerce, eight firearms, namely, a Glock, Model 23, .40 caliber semiautomatic pistol bearing serial number BCXV991; Walther, Model UZI Pistol, .22 caliber semiautomatic pistol bearing serial number W1018088; Romarm/Cugir, Model Micro Draco 7.62x39 caliber semiautomatic pistol bearing serial number PMD-17851-19; Century Arms, Model VSKA Pistol, 7.62x39 caliber semiautomatic pistol bearing serial number SV7P007415; Interarms, Model Sporter, 7.62x39 caliber semiautomatic rifle bearing serial number PAC1118656; I.O. Inc, Model Sporter, 7.62x39 caliber semiautomatic rifle bearing serial number S004592; Century Arms, Model VSKA, 7.62x39 caliber semiautomatic rifle bearing serial number SV7065232; I.O. Inc, Model Sporter, 7.62x39 caliber semiautomatic rifle bearing serial number S030772, which firearms had traveled in

34

interstate commerce prior to the defendant's possession of the firearms, in violation of Title 18, United States Code, Section 922(g)(1).

FURTHER AFFIANT SAYETH NOT.

*Thomas Spratte*

THOMAS SPRATTE
Special Agent, Bureau of Alcohol, Tobacco,
Firearms & Explosives

Sworn to and affirmed by telephone on June 26, 2022

Honorable YOUNG B. KIM
United States Magistrate Judge

35